UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
PITKIN SUPERMARKET, INC,

           Plaintiff,

    -against-

UNITED STATES OF AMERICA and HON.
TOM VILSACK, Secretary of Agriculture,

           Defendants.
------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
14-CV-1943 (CBA) (JO)

**AMON, United States District Judge:**

Plaintiff Pitkin Supermarket, Inc. ("Pitkin") brings this action against the United States[1] pursuant to the Food Stamp Act, 7 U.S.C. § 2023(a)(13),[2] and the Fifth and Sixth Amendments to the United States Constitution. Pitkin challenges an administrative decision by the Food and Nutrition Service ("FNS") of the United States Department of Agriculture ("USDA") permanently disqualifying it from accepting benefits from the Supplemental Nutrition Assistance Program ("SNAP" or "the Program"). Pitkin seeks review of the USDA's decision to remove it from SNAP and a declaratory judgment finding that the procedures used to remove it from SNAP are unconstitutional. (D.E. # 1 ("Compl.") ¶¶ 10–14, 18.) The United States moves for summary judgment on, or dismissal of, all of the claims. For the reasons stated below, the case is dismissed.

## BACKGROUND[3]

SNAP is a federal program, administered by the FNS under the auspices of the USDA, "designed to promote the general welfare and to safeguard the health and well being of the Nation's

---

[1] As indicated in the caption of this case, Pitkin also named Secretary of Agriculture Tom Vilsack as a defendant. At oral argument on the instant motion, however, Pitkin withdrew its claims against Vilsack. (D.E. dated January 13, 2016.)

[2] Pitkin cites 7 U.S.C. § 2023(a)(15) in the complaint, (D.E. #1 ¶ 4), but that provision merely elaborates on the right to bring a suit under § 2023(a)(13).

[3] The facts below derive from the parties' submissions pursuant to Local Rule 56.1, (see D.E. # 19-2 ("Def. 56.1"); D.E. # 16 at 1–2 ("Pl. 56.1"); D.E. # 20-1 ("Def. Reply 56.1"), and from the Court's independent review of the record.

1

population by raising the levels of nutrition among low-income households." (Def. 56.1 ¶¶ 1–2 (quoting 7 C.F.R. § 271.1).) Under the Program, eligible households receive coupons, which they can exchange for certain food items at authorized stores. (See id. ¶ 5.) For their part, "[r]etail and wholesale food stores" must seek "authorization to accept and redeem SNAP benefits." (Id. ¶ 3.)

The failure of an authorized store to comply with SNAP regulations may result in fines or disqualification from the Program. (Id. ¶ 4.) For example, stores whose personnel engage in "trafficking" of Program benefits, as defined in 7 C.F.R. § 271.2, shall be permanently disqualified from accepting and redeeming SNAP coupons. (Id. ¶ 8 (citing 7 C.F.R. § 278.6(e)(1)(i)) Even a single instance of trafficking triggers permanent disqualification, (id. ¶ 9 (citing 7 U.S.C. § 2021)), except in limited cases where the store demonstrates that it should have to pay a civil money penalty instead, (id. ¶ 10). "Trafficking" encompasses "[t]he buying, selling, stealing, or otherwise effecting exchange of SNAP benefits . . . for cash." (Id. ¶ 7 (quoting 7 C.F.R. § 271.2) (alterations in original).)[4]

In October of 2011, Pitkin became an authorized SNAP vender. (Id. ¶ 17.) According to the government, an unidentified agent operating under the supervision of the USDA visited Pitkin several times between August 26, 2013, and September 11, 2013. (Id. ¶ 18). The government claims that the agent recorded multiple transactions that violated SNAP regulations—three or four involving the exchange of SNAP coupons for ineligible, non-food items, and two involving the

---

In its response to the United States' Rule 56.1 Statement, Pitkin notes that, "[w]here the allegation is not in dispute Plaintiff will remain silent." (Pl. 56.1 at 1.) Pitkin "remains silent" with respect to the majority of the facts asserted by the United States. In the subset of cases where Pitkin disputes the United States' stated facts, it does so without pointing to evidence in the record that forms the basis of the dispute. Instead, Pitkin often claims to dispute the assertion because, "except for the government representation plaintiff has no way of knowing that such occurred." (E.g., id. ¶ 3.) This is not a proper method for disputing facts in a Rule 56.1 Statement. See Local Rule 56.1(d)). The Court has nevertheless reviewed the record itself rather than simply deeming those facts admitted.

[4] Stores may only give customers cash in exchange for SNAP benefits when returning limited amounts of change for authorized transactions. (Defs. 56.1 ¶ 6.)

2

exchange of SNAP coupons for cash. (Id. ¶¶ 20–26.) The agent provided a description of the clerk who allegedly processed all of the transactions in question, identifying him as a male of 30 to 35 years of age, who is between 5'7" and 5'10", weighing between 175 and 185 pounds. (Id. ¶ 28.)

Pitkin claims that no one fitting that description worked the register at the store during the relevant time. (Pl. 56.1 ¶ 11.) Without pointing to facts in the record, Pitkin also disputes that an agent visited several times during the span identified by the government, (id. ¶ 3), and further disputes the occurrence of most of the allegedly improper transactions, (see id. ¶¶ 5–10). Originally, Pitkin did not dispute the United States' claim that, on September 11, 2013, it "accepted SNAP benefits in exchange for $20.00 in cash." (Def. 56.1 ¶ 26; see also generally Pl. 56.1.) After this omission was pointed out at oral argument, (Jan. 13, 2016, Hr'g Tr. 3:16–5:1), Pitkin appears to have attempted to dispute that transaction in a subsequent affidavit submitted by its president, MD Sohidul Islam, (D.E. # 26 ("Supp. Aff.") ¶ 2).[5]

On October 30, 2013, Pitkin received a "Charge Letter" from the Retail Operations Division ("Retail Operations") of FNS that notified Pitkin of the problematic transactions. (Def. 56.1 ¶¶ 31–32). The Charge Letter was accompanied by a copy of the USDA's Investigation Report, (id. ¶ 33), and gave Pitkin 10 calendar days (from October 30, 2013, the date of receipt) to supply FNS with the documentation necessary to replace permanent disqualification from SNAP with a monetary penalty. (Id.) On November 4, 2013, Pitkin's counsel scheduled a meeting with Retail Operations for November 7. (Id. ¶ 34.) Pitkin twice postponed that meeting, ultimately delaying it until November 19, 2013. (See id. ¶¶ 35–39.)

---

[5] Pitkin's intended meaning in its supplemental submission is not entirely clear, as the affidavit is practically incoherent.

At the meeting on November 19, Pitkin indicated that it would appeal any decision permanently disqualifying it from the Program. (Id. ¶ 40.) Pitkin claimed that there had been no SNAP violations, that no clerk at the store matched the description given in the Investigation Report, and that it was willing to provide photographs of all store clerks. (Id. ¶¶ 40–41.) Pitkin argued it should have the chance to confront the agent to assess his or her credibility. (Id. ¶ 54.) Retail Operations declined the photos once it became clear that Pitkin was not offering video from inside the store on the days of the relevant transactions. (Id. ¶¶ 42–43.) Retail Operations also informed Pitkin that the penalty for trafficking is permanent disqualification. (Id. ¶ 45.)

On November 20, 2013, the day after the meeting, Retail Operations sent Pitkin a "Determination Letter" permanently disqualifying it from SNAP. (Id. ¶ 49.) As of that date, FNS had not received a request from Pitkin for a monetary penalty instead of disqualification. (Id. ¶ 47.) Additionally, as of that date, the United States claims that Pitkin had submitted no evidence that it would have qualified for an alternative penalty, (id. ¶ 48), although Pitkin disputes this particular point, (id. ¶ 48).[6]

The Determination Letter arrived—and its announcement of Pitkin's permanent disqualification became effective—on November 22, 2013. (Id. ¶ 51.) In the letter, FNS noted its finding that trafficking violations had occurred at Pitkin, and that Pitkin failed to demonstrate that it met the criteria for a monetary penalty in lieu of disqualification. (Id. ¶ 52.) On November 29, 2013, Pitkin requested administrative review of the FNS determination by the USDA Administrative Review Branch of the Benefit Redemption Division ("ARB"). (Id. ¶ 53.) Pitkin argued that the Determination Letter neglected to address Pitkin's request to confront the

---

[6] Pitkin once again omits any citation to the record to support the basis for this dispute. Pitkin alleges only that it "did attempt to explain training and notification to employee[s] as to rules of SNAP," (Pl. 56.1 ¶ 13), although it does not indicate when, in what format, or to whom it provided that information, and it does not allege that such information alone would be adequate to support a monetary penalty instead of disqualification.

4

unidentified agent who documented the violations, and Pitkin asserted constitutional violations as a result. (Id. ¶¶ 54–55.) Pitkin also asked for a stay of the disqualification. (Id. ¶ 56.)

On December 4, 2013, ARB sent a letter to Pitkin's counsel, which arrived on December 5. (Id. ¶¶ 57, 59.) The letter acknowledged receipt of Pitkin's request for an administrative review of the disqualification decision, (id. ¶ 57), and informed Pitkin that it should submit any further information that might be relevant for the review, (id. ¶ 58). The letter also notified Pitkin that it was not entitled to a stay of the disqualification. (Id.) On January 15, 2014, ARB received an email from Pitkin's counsel, noting that Pitkin would not be submitting any additional information and that it sought a "prompt final determination" so that it could move on to seek review of the disqualification decision in court. (Id. ¶¶ 60–61.)

On February 24, 2014, the ARB sent out its Final Agency Decision ("FAD"), "which sustained the permanent disqualification," (id. ¶ 62), and which Pitkin received on February 26, 2014, (id. ¶¶ 68–69). The FAD highlighted "three separate occasions" where Pitkin "sold expensive and conspicuously ineligible items . . . in exchange for SNAP benefits" and "two occasions" where Pitkin "accepted SNAP benefits in exchange for cash." (Id. ¶ 63.) It found the latter two instances to constitute SNAP benefit trafficking. (Id.) The FAD also indicated that transaction data received from Pitkin helped confirm these findings because the dates and amounts listed aligned exactly with the information recorded in the Investigation Report. (Id. ¶ 64.) The FAD did not credit Pitkin's argument that none of its clerks matched the agent's description in the Investigation Report, noting that such a description "is aimed to be general." (Id. ¶ 65.)

Pitkin filed the instant action on March 26, 2014. (Compl. at 1.) A new corporation that was registered with the New York State Department of State on January 28, 2014, now occupies the address where Pitkin operated. (Def. 56.1 ¶¶ 70–72.) That company, Asian Super Market and

Halal Meat, Inc., is an authorized SNAP provider.[7] (Id. ¶¶ 70, 73.) Pitkin appears to persist as a corporate entity, (D.E. # 16 ("Pl. Opp.") at 2), but without the store at which the violations allegedly took place. Before oral argument, Pitkin expressed no intention to open another store that would seek to accept SNAP benefits, noting only that "if vindicated, plaintiff can consider opening another market." (Id.) The supplemental affidavit submitted by Islam states further that, if he can pay off $70,000 in debt, "[he] desperately want[s] to go back into business and open a similar store." (Supp. Aff. ¶¶ 5–6.) Islam acknowledges, however, that he does not know "whether or not [he] will still be able to use the Pitkin Corporation at that time." (Id. ¶ 6.) Islam also does not specify whether he would seek to enroll a new store in SNAP. (See id.)

On May 18, 2015, the United States filed a motion to dismiss Pitkin's complaint and for summary judgment. (D.E. # 19.) In advance of the oral argument, on December 9, 2015, the Court directed both sides to submit supplemental briefing on redressability by December 11. (D.E. # 22 at 1–2.) Defendants submitted a timely brief. (See D.E. # 23 ("Def. Supp. Br.").) Pitkin did not respond to the Court's order, and after oral argument, Islam submitted a supplemental affidavit, (see Supp. Aff.).

## DISCUSSION

"Standing 'is an essential and unchanging part of the case-or-controversy requirement of Article III.'" Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). To have such Article III standing, "the plaintiff [must have] 'alleged such a

---

[7] Pitkin disputes defendants' proffered facts concerning Asian Super Market, but instead of citing facts in the record, argues that "plaintiff is still entitled to seek review and to challenge the procedures of the government." (Pl. 56.1 ¶ 15.) Pitkin appears to be disputing the legal relevance of the facts rather than the facts themselves, and the Court therefore deems these facts admitted. Additionally, Pitkin does not dispute that it has ceased operations. (See D.E. # 16 at 2.)

personal stake in the outcome of the controversy' as to warrant [its] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on its behalf." Warth v. Seldin, 422 U.S. 490, 498–99 (1975) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)). Article III standing comprises "three 'irreducible' elements": (1) "injury-in-fact, which is a 'concrete and particularized' harm to a 'legally protected interest,'" (2) "causation in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant," and (3) "redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief." W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008) (citing Lujan, 504 U.S. at 560–61). As Supreme Court and Second Circuit precedent make clear, "standing is to be determined as of the commencement of suit," Azim v. Vance, 530 F. App'x 44, 45 (2d Cir. 2013) (quoting Lujan, 504 U.S. at 570 n.5 (internal quotation marks omitted)), and is properly understood as an "evaluat[ion] of [a plaintiff's] personal stake as of the outset of the litigation," Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 70 (2d Cir. 2001) (quoting Cook v. Colgate, 992 F.2d 17, 19 (2d Cir. 1993) (brackets in original)).

The question of standing "bears close affinity" to the question of mootness, which is "whether the occasion for judicial intervention persists" throughout the litigation. Warth v. Seldin, 422 U.S. 490, 499 n.10 (1975). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Cty. of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (quoting Powell v. McCormack, 395 U.S. 486, 496 (1969)). "[F]ederal courts are without power to decide questions that cannot affect the rights of litigants in the case before them. "The inability of the federal judiciary to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." DeFunis v. Odegaard, 416 U.S. 312, 316 (1974)

7

(internal quotation marks and citations omitted). A case becomes "moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." Chevron Corp. v. Donziger, 833 F.3d 74, 124 (2d Cir. 2016); see also Cook v. Colgate Univ., 992 F.2d 17, 19 (2d Cir. 1993) (a case becomes moot "when it becomes impossible for the courts, through the exercise of their remedial powers, to do anything to redress the injury"). "[T]he party seeking to have the case dismissed bears the burden of demonstrating mootness and that burden 'is a heavy one.'" Etuk v. Slattery, 936 F.2d 1433, 1441 (2d Cir. 1991) (quoting Cty. of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)).

The United States first argues that Pitkin lacks standing because the redressability element is not satisfied. (Def. Supp. Br. at 1–2.) It contends that Pitkin cannot demonstrate redressability because it shut down before the complaint in this lawsuit was filed and it has no intention to open another store that would seek to accept SNAP benefits. (Id. at 2–5.) However, the Court's independent review of the record reveals that it does not contain conclusive evidence concerning the date on which Pitkin ceased operations and it is unclear if the store closed before Pitkin filed the complaint in this lawsuit on March 26, 2014.[8] The only relevant evidence are records showing that a new entity registered as a corporation on January 28, 2014, and the address for that corporation's registered agent was the same as Pitkin's address, (Def. 56.1 ¶¶ 70–71), but there is no evidence in the record indicating whether Pitkin ceased operations on that date or at any point before this action was initiated. The undisputed evidence thus does not permit the Court to conclude that Pitkin ceased operations before commencing this lawsuit.

---

[8] At oral argument, the Court asked Pitkin if it shut down before filing the complaint in this lawsuit, but Pitkin did not provide a clear answer; Pitkin merely stated, "He may very well have been thrown out of business by this by the time this action was filed in this Court." (Jan. 13, 2016 Hr'g Tr. 6:1–3.)

Although the exact date on which Pitkin closed is unclear, it is clear from the record that at some point in time since it initiated this lawsuit, Pitkin ceased operations. (See, e.g., Supp. Aff. ¶ 5 ("[T]he government put me out of business.").) Where circumstances change subsequent to the filing of the complaint—even where those changes stem from the plaintiff's own choices or intentions—the plaintiff's "standing" is not altered, see Comer, 37 F.3d at 791, but those changes may leave the plaintiff without a legally cognizable interest in the outcome of the case and thus render the case moot, Azim, 530 F. App'x at 46. The Court can thus determine whether it has jurisdiction over the instant case by evaluating whether the closing down of Pitkin constitutes a change in circumstances that renders the case moot. Id. (declining to resolve standing issue because regardless of whether plaintiffs had standing at the start of the action, their claims were rendered moot during the course of the litigation).

Courts have held that when a regulated business challenges a government regulatory policy or action and then terminates its operation during the pendency of the litigation, the controversy may become moot. See, e.g., Munsell v. Dep't of Agriculture, 509 F.3d 572, 581–82 (D.C. Cir. 2007) ("Normally, once a regulated business has voluntarily removed itself from the ambit of government oversight, it no longer has a legally cognizable interest in the outcome of litigation that seeks to challenge a government regulatory policy or action."). The mootness analysis turns in part on whether the business challenging a regulatory policy or action intends to reopen and subject itself to regulatory oversight again in the future.

In cases where a business owner has indicated an intention or desire to resume operations if the government action at issue is successfully challenged, courts have held that there is standing and the plaintiff business owners' claims are not moot. See, e.g., White River Amusement Pub, Inc. v. Town of Hartford, 481 F.3d 163, 168 (2d Cir. 2007) (although nude-dancing establishment

was destroyed by fire, the owner's challenge to ordinance prohibiting public nudity was not moot, since operator "expressed a clear intent to reopen" the establishment in the future and had a renewable lease on the premises, which it did not intend to terminate); Clark v. City of Lakewood, 259 F.3d 996, 1012 (9th Cir. 2001) (owner of closed adult businesses still had a legally cognizable interest in the outcome of his lawsuit sufficient to allow him to seek injunctive relief, since his stated intention was to return to business). However, a closed business with no intent to reopen does not maintain a live controversy. See, e.g., City News & Novelty, Inc. v. Waukesha, 531 U.S. 278, 284–85 (2001) (holding that challenge to adult business licensing determination was moot where plaintiff "ceased to operate as an adult business" and "neither now pursues nor currently expresses an intent to pursue a license"); Bd. of License Comm'rs of Town of Tiverton v. Pastore, 469 U.S. 238, 239 (1985) (finding a case concerning a business's liquor license moot after the business closed, as a result of which "no decision on the merits [could have] an effect on the [plaintiff]"); Beechwood Restorative Care Ctr. v. Thompson, 494 F. Supp. 2d 181, 189–90 (W.D.N.Y. 2007) (dismissing action challenging termination of nursing home from participation in Medicare and Medicaid programs where the nursing home ceased operations and there was no indication in the record that plaintiff intended or desired to reopen the home or a similar facility).

Here, Pitkin has ceased operations and its president, Islam, expresses only a speculative—and, at best, aspirational—intention of opening a new store. He acknowledges that such a store might not actually be opened by the plaintiff in this suit, Pitkin. (See Supp. Aff. ¶¶ 5–6.) Islam further fails to specify whether any future store he hopes to open would seek to accept SNAP benefits.[9] (See id.) Therefore, although Pitkin still exists as a corporate entity, it appears entirely

---

[9] Pitkin also submits a blank "Application for Alcoholic Beverage Control Retail License." (See D.E. # 18 ("Katz Decl."), Ex. D.) Pitkin highlights a portion of that application to suggest that its disqualification from SNAP could have negative implications for its ability to secure a liquor license. (Katz Decl. ¶ 7.) Yet the section of the application highlighted by Pitkin only asks applicants to disclose previous liquor licenses that were "revoked, canceled or

speculative whether a favorable decision—namely, a reversal of the USDA's decision to disqualify Pitkin from SNAP and declaratory judgment that the procedures used to disqualify it were unconstitutional—would grant any effectual relief to Pitkin. Mere speculation that a business could again decide to operate, without more, "does not shield the case from a mootness determination." City News & Novelty, Inc., 531 U.S. at 283. Because Pitkin has ceased operations and has not expressed an intention to reopen as a regulated entity, the Court concludes that its claims are moot.

## CONCLUSION

For the foregoing reasons, Pitkin's claims are dismissed. The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

Dated: November 21, 2016
Brooklyn, New York

Carol Bagley Amon
United States District Judge

---

otherwise involuntarily terminated." (Katz Decl. Ex. D at 17.) Pitkin's disqualification from SNAP is therefore irrelevant to a future liquor license application. Further, even if Pitkin were required to disclose its SNAP disqualification on an application for a liquor license, the possible harm posited by Pitkin would remain entirely hypothetical, as Pitkin has indicated no intention of even seeking such a license.

11